NOT DESIGNATED FOR PUBLICATION

| | | |
|---|---|---|
| IN RE: INTERDICTION OF STEPHANIE R. DEHOOG | * | NO. 2025-CA-0543 |
| | * | |
| | | COURT OF APPEAL |
| | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2023-01979, DIVISION "J"
Honorable D. Nicole Sheppard
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*

(Court composed of Judge Karen K. Herman, Judge Nakisha Ervin-Knott, Judge Monique G. Morial)

Jeremy T. Grabill
Lindsay Calhoun
PHELPS DUNBAR LLP
365 Canal Street, Suite 2000
New Orleans, LA 70130

Bianca M. Brindisi
BRINDISI LAW, LLC
3012 19th Street
Metairie, LA 70002

  COUNSEL FOR APPELLANTS – DEREK AND ELEANOR DEHOOG


Stacey L. Meyaski
K. Todd Wallace
WALLACE MEYASKI, LLC
5190 Canal Street, Suite 102
New Orleans, LA 70124

  COUNSEL FOR APPELLEE – STEPHANIE R. DEHOOG

**JUDGMENT DISMISSING PETITION FOR FULL AND LIMITED
INTERDICTION REVERSED; JUDGMENT OF LIMITED
INTERDICTION RENDERED; REMANDED FOR APPOINTMENT
OF CURATOR/UNDERCURATOR IN ACCORDANCE WITH
INSTRUCTIONS; JUDGMENT ALLOWING MR. KING TO BE**

**COMPENSATED AS CURATOR *AD HOC* THROUGH MARCH 28, 2025 REVERSED; JUDGMENT RENDERED ORDERING MR. KING TO REFUND ALL FEES RECEIVED AFTER JUNE 13, 2023, WITHIN NINETY DAYS OF THIS OPINION**

**FEBRUARY 24, 2026**

KKH
NEK
MGM

Derek DeHoog (Mr. DeHoog") and his daughter Eleanor (collectively, "Appellants"), appeal the May 22, 2025 judgment denying their Petition for Full Interdiction, or in the Alternative, Petition for Limited Interdiction and for Appointment of Curator and Undercurator, and dismissing the petition for interdiction of Stephanie R. DeHoog ("Ms. DeHoog") with prejudice.  For the reasons that follow, the judgment is reversed, rendered, and remanded with instructions consistent with this opinion.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

This appeal involves a protracted interdiction proceeding.  Mr. DeHoog and Ms. DeHoog were married in 2004, and divorced in 2021.  They have two children, Eleanor, born in 2005, and Grant, born in 2007.  As of the date of the trial court proceedings, both were attending boarding school out of state.

Mr. DeHoog filed his first petition for interdiction in February of 2021.  He submits that the petition was filed following Ms. DeHoog's admission to University Medical Center ("UMC") for psychiatric evaluation wherein she was diagnosed with schizoaffective disorder.  Mr. DeHoog later dismissed the petition.

1

In September of 2022, after Ms. DeHoog was involuntarily hospitalized in St. Charles Parish for exhibiting bizarre behavior, Ms. DeHoog's sister, Sydney Romare ("Ms. Romare"), filed a second petition for interdiction. That petition was also voluntarily dismissed.

On March 8, 2023, Mr. DeHoog, together with Eleanor, filed this petition for interdiction, again asserting that Ms. DeHoog has a long history of psychotic episodes and lacks the ability to make reasoned medical and financial decisions. On March 21, 2023, the trial court appointed C. Hunter King ("Mr. King") curator *ad hoc* for Ms. DeHoog, as she was unrepresented by counsel. Ms. DeHoog retained private counsel shortly thereafter. On June 21, 2023, Gina M. Manguno-Mire, Ph.D. ("Dr. Mire") was appointed to prepare an evaluation report on Ms. DeHoog. The report was completed on June 18, 2024.

A two-day trial was conducted on July 1 and July 2, 2024, which included the testimony of Dr. Mire, Mr. DeHoog, Eleanor, Ms. Romare, and Ms. DeHoog.

***Testimony of Dr. Mire***

In connection with her appointment, Dr. Mire conducted a forensic interview with Ms. DeHoog on December 21, 2023. In preparing her report, Dr. Mire also performed psychological testing, reviewed medical records from Ms. DeHoog's prior hospitalizations, and interviewed family members. Dr. Mire's report was introduced into evidence.

Dr. Mire diagnosed Ms. DeHoog with "schizoaffective disorder, which is a psychotic disorder, along with a mood disorder." She explained that the condition is usually chronic, meaning that a person has it for their lifetime. Dr. Mire noted that Ms. DeHoog has been on psychiatric medication for fifteen to twenty years.

2

Dr. Mire was aware that Ms. DeHoog first became psychotic in 2003 following an international flight from Portugal while performing her duties as a flight attendant.  As a result, she was hospitalized in New Jersey.  Dr. Mire did not have records from that incident.

Dr. Mire detailed Ms. DeHoog's medical history, including numerous hospitalizations/involuntary commitments, from 2008 through 2022, which were prompted by incidents of psychotic behavior, including paranoid delusions, hallucinations, and physical aggression.  The involuntary hospitalizations and medical treatment plans include the following:[1]

1.  Hospitalization at River Oaks Hospital on October 22, 2008, on a Physician's Emergency Certificate ("PEC") due to "worsening paranoia" and an exacerbation of pre-existing depression.  On admission, Ms. DeHoog was described as "initially very psychotic."  She was diagnosed with Psychotic Disorder Not Otherwise Specified (NOS), Anxiety Disorder (NOS), and Rule Out Bipolar Disorder.  At that time, it was determined that Ms. DeHoog was reluctant to take her antipsychotic medications, evidencing "poor insight into her illness."

2.  Hospitalization at LSU Hospital on November 21, 2009, after a verbal altercation with her husband.  She was noted to have "delusional and paranoid thoughts."  The diagnosis was Depression and Psychosis (NOS).  Anxiety medication was prescribed.

3.  Transferred to River Oaks Hospital for treatment where Ms. DeHoog remained until December 5, 2009.  She was discharged to a Partial Hospital Program until

---

[1] Much of the detail regarding Ms. DeHoog's medical history is also documented in Dr. Mire's report.

3

December 31, 2009, to follow up with her treating psychiatrist, Dr. Gayle Stewart. ("Dr. Stewart").

4. Ms. DeHoog treated with Dr. Stewart for management of her prescribed medications. Dr. Stewart provided various psychiatric diagnoses including, "Psychotic DO NOS, Major Depressive Disorder, recurrent, moderate, Major Depressive Disorder, with psychotic features, Bipolar II." Dr. Stewart noted that Ms. DeHoog often expressed a desire to lower the dosage for Geodon, her antipsychotic prescription. Dr. Stewart's last contact with Ms. DeHoog was on December 11, 2020. Ms. DeHoog informed Dr. Stewart that she had discontinued taking Geodon because she "felt she was stable."

5. Hospitalization at River Oaks Hospital under an involuntary commitment order on November 15, 2020, due to "worsening psychotic symptoms and aggressive behavior." She was discharged on December 5, 2020. It was determined that Ms. DeHoog "exhibited poor insight into her mental health and disagreed with her psychiatric diagnosis."

6. Hospitalization at UMC on February 3, 2021, after being brought in by the St. Bernard Parish Sheriff's Office for exhibiting "paranoid delusions, and non-directional walking in traffic." Ms. DeHoog was involuntarily committed on a PEC for medication non-compliance, worsening bizarre behavior, and aggression. An Order of Protective Custody signed by Ms. DeHoog's sister, Sheree indicated that "[s]he doesn't take her medicines, refuses to see a psychiatrist, she hallucinates, she screams in our faces, I'm fearful she is going to hit my mom." A Coroner's Emergency Certificate ("CEC") extended the involuntary hospitalization. It was noted that Ms. DeHoog was off of her Geodon prescription for over a year. She eventually became medication compliant after being allowed

4

to inspect the medicine packaging. She was discharged on February 21, 2021, to the care of a friend. Ms. DeHoog was encouraged to follow up with Dr. Jill McCall at Integrated Behavioral Health, although she did not.

7. Hospitalization at River Place Behavioral Health on May 10, 2021, transported by the New Orleans Police Department on a PEC for "psychosis and violent behavior towards her husband." Records indicate that she believed her husband controls drones with special magnetic fields and that they are controlling her and causing her pain. Ms. DeHoog initially refused to take her antipsychotic medication. It was reported that she had "very poor insight into her illness." She was discharged on May 28, 2021.

8. Transferred to Beacon Hospital Intensive Outpatient Program ("IOP") on June 9, 2021, after her discharge from River Place Hospital due to "severity of symptoms, failure of outpatient treatment and multiple recent hospitalizations." Upon admission, Ms. DeHoog "demonstrated limited insight, did not believe she needed medication." After one month, Ms. DeHoog exhibited improvement and was discharged early on August 18, 2021.

9. Hospitalization at St. Charles Parish Hospital on a PEC dated September 9, 2022. In her testimony, Dr. Mire described this hospital admission as follows:

> So, Ms. DeHoog essentially has the same — pretty much the same symptoms every time. It's a very consistent pattern. So at that time she was involuntarily admitted to St. Charles Hospital for what they call grave disability due to bizarre behavior, such as leaving her home due to noises, driving her car at all hours of the night. She was very fearful that something was wrong with her children, that they were either dead or in Angola. She thought people could read her thoughts. She thought her phone was being hacked. So she was essentially — you know, they think possibly off of her medication, driving around southern Louisiana, sleeping in cars, ending up in different cities, all because, you know, she was fearful of things or checking out things that didn't seem to be based in reality.

The hospital records also indicated that the nursing staff caught Ms. DeHoog spitting out her medications into a napkin. Dr. Mire explained:

> She thought she was placed in the hospital because of her family and her husband being against her, so she thought it was sort of a conspiracy, and she wasn't aware that she was ill, so she didn't think that she needed the medication.
>
> She also was fearful that things were in her mattress or maybe she was being poisoned with the medication, so she didn't want to take it. They continued to work with her on taking the medication. I think they considered maybe involuntarily medicating her, but she eventually did start to take the medication after concessions were made, like, allowing her to inspect the packaging, you know, seeing that it was truly administered by a nurse and that the packaging matched what it said and those kinds of things.

A CEC was issued on September 10, 2022, extending her confinement at St. Charles Parish Hospital. Ms. DeHoog spent a month in the hospital where Dr. James McConville, Jr. ("Dr. McConville") indicated that he would file for judicial commitment due to the likelihood of medication non-compliance. Dr. McConville also reported that Ms. DeHoog met the criteria for civil involuntary outpatient because "she was dangerous to herself and gravely disabled." Ms. DeHoog was discharged on October 3, 2022, to live with her mother, and court ordered to attend outpatient treatment.

10. Readmission to the Beacon Hospital's IOP on October 11, 2022. Ms. DeHoog was "rated highly on a symptom measure of anxiety, emotional withdrawal, conceptual disorganization, grandiosity, depressed mood, suspiciousness, uncooperativeness, and unusual thought content." It was reported that Ms. DeHoog "struggled to gain insight" throughout her treatment. She was discharged on December 8, 2022.

Dr. Mire testified that Ms. DeHoog has been prescribed various antipsychotic drugs to manage her condition. However, she noted that Ms.

6

DeHoog has a history of voluntarily getting off her medications.  Additionally, Dr. Mire explained that Ms. DeHoog has no insight into her condition.  She opined that when Ms. DeHoog is in a state of psychosis, she will likely not seek medical treatment.

When asked her recommendation on interdiction, Dr. Mire explained:

> Yes. And, again, this is coming from a psychologist, not a lawyer, and I don't do a ton of interdiction work so it may not be fully informed, but — this was a difficult case. And so one of the things I was thinking about was, because there was such a significant concern about her relapsing in her mental illness and the severity of her mental illness when she has it, it felt incomplete to offer a recommendation of no interdiction. Although that may be the only — you know, available legal option, because I don't think she needs to be interdicted when she's well.

> But based on all of the evidence that I've seen and what I would predict will likely happen, at some point she will become ill again. She won't seek treatment on her own, and she'll need help. And I thought that balancing her need for help with her ability to maintain her civil rights as a fully functioning person, if there was a way to craft a legal agreement that could be enacted when she was ill that allowed her to continue to function until that time, I searched sort of if there was a legal remedy for that, and I don't know that there is.

Dr. Mire was asked the likelihood that Ms. DeHoog would experience another psychotic episode if she were to stop taking her antipsychotic medications today.  She responded, "[a]nd I almost never say this, I think it would be almost certain."  Moreover, Dr, Mire agreed that it was only a question of when it will happen.

Regarding a potential curator for interdiction, Dr. Mire opined that Eleanor has the capacity and capability to act on her mother's behalf.  She described Eleanor as very intelligent, and considered Eleanor to be the best choice for undercuratrix.  Dr. Mire also described Mr. DeHoog as being very supportive.

7

Although she thought Mr. DeHoog has the knowledge and ability to act as curator, she believed it would create a conflict.

***Testimony of Mr. DeHoog***

Mr. DeHoog testified that he personally witnessed much of the same behavior as documented in Ms. DeHoog's medical records, *e.g.*, mania, anxiety, sleeplessness, and statements made with no basis in reality. Ms. DeHoog accused him of being a member of a mob, the KKK, a terrorist involved in September 11, a drug trafficker, and a pedophile. Mr. DeHoog described the negative effect that Ms. DeHoog's behavior has had on the children. He explained that their son had to call the police on the occasion when she was admitted to River Place Behavioral in 2021. He reported that Ms. DeHoog tried to choke their son four times, and that once Eleanor had to intervene when Ms. DeHoog tried to hit her sisters. The children were emancipated in response to Ms. DeHoog's actions toward them.

Mr. DeHoog described in detail his involvement with Ms. DeHoog's hospitalizations*, e.g.*, speaking with the doctors regarding her treatment plans and her medications. He also related that he helped Ms. DeHoog with housing, moving her in and out of apartments, helping her pack, hiring movers, *etc*. At one time, he moved Ms. DeHoog back into the family home because he was worried that her health was deteriorating. He believed that if he kept her close, he could help when the time came.

In July of 2014, Ms. DeHoog executed a power of attorney in favor of Mr. DeHoog and her sister. Ms. DeHoog later revoked the power of attorney.

Mr. DeHoog testified that when Ms. DeHoog is not taking her medications she has no ability to make decisions. He explained that as curator he would work with the doctors in order to stay involved in her medical care. In particular, he

would advocate for the long-acting injectable medications, which had been recommended by Ms. DeHoog's doctors. He believed that would remove the daily decision of having to take her medicine. He feared that Ms. DeHoog would abandon her medication again when she starts feeling better. Mr. DeHoog asked the court to allow her family to be empowered to take care of her, not to control her. Mr. DeHoog stated that if he were not appointed curator, he hoped the court would consider Eleanor.

### Testimony of Eleanor – via Zoom

Eleanor was nineteen years old at the time of the trial. She was planning to attend Barnard College at Columbia University in the fall.

Eleanor stated that in the summer going into her ninth-grade year of boarding school, she saw a rapid decline in her mother's mental health, describing strange and paranoid behaviors. Eleanor explained that her mother had been physical with her dad and brother. Other times, Ms. DeHoog tried to hit her sisters, which happened during the court ordered supervised visitations with her mom; Eleanor had to intervene. Explaining why she sought emancipation, Eleanor stated "I didn't have the agency that I wanted to be able to remove myself from those situations if it got to the point where things were getting physical between us."

Eleanor testified that she has trouble trusting her mother to know when to take her medications. Although, she stated that there have been times when Ms. DeHoog is still physically abusive while on her medication.

Eleanor believed interdiction was necessary because "it's not a matter of if my mom will be hospitalized, but rather a matter of when." She thought it was crucial to have support systems in place, that have not been there in the past.

9

Regarding Ms. DeHoog's finances, Eleanor testified that growing up, she never saw her mother handle any of the finances, and she witnessed her mother engage in excessive spending sprees. Eleanor did not feel that her mother was capable of managing her finances, particularly when she is not well.

Eleanor believed she was capable and responsible enough to act as curatrix. She felt her mom trusted her. Finally, Eleanor stated that she would rather it be her, or someone in the family, as opposed to an attorney or somebody else.

***Testimony of Ms. Romare***

Ms. Romare described her relationship with Ms. DeHoog as "awesome." She thought her sister's mental health was "excellent" and that she was "doing 110 percent awesome." Ms. Romare believed that Mr. DeHoog put her in a bad place mentally. She denied calling Mr. DeHoog for help with her sister over the years. Ms. Romare explained that she only called the police or tried to get her committed "when it got to the point that [Mr. DeHoog] pushed [Ms. DeHoog] mentally to a place where I couldn't personally get her back on my own so I had to get medical help…." She denied asking for Mr. DeHoog's help regarding a PEC before she went to River Place Hospital. Ms. Romare considered Mr. DeHoog to be the "orchestrator." She explained that when she visited her sister in the hospital, "[s]he was good because she was getting the care that she needed. She was away from him, and he's … very controlling, and he's manipulative."

Ms. Romare stated that she was involved when Ms. DeHoog was admitted to the St. Charles Parish Hospital, but that in her recollection, Ms. DeHoog was "completely fine at that time." Specifically, she stated that "[f]rom the first time she was admitted to the first time I got to see her, yes. Yeah, she was 100 percent better." She thought her sister was "back on the road to recovery."

10

Ms. Romare did not think her sister needed to be interdicted. She explained that Mr. DeHoog coerced her into filing the interdiction proceedings.

On cross examination, Ms. Romare stated that she was not on good terms with her sister in 2020 and 2021. She acknowledged that she contacted UMC because Ms. DeHoog was not taking her medication and she was fearful that Ms. DeHoog was going to hurt their mother. Ms. Romare also acknowledged that they got into a fight and that Ms. DeHoog was physical with her.

### Testimony of Ms. DeHoog

Ms. DeHoog testified that she was presently working as an international flight attendant, with a second part-time job at a local furniture store. She explained that she lives alone and manages her own affairs. Ms. DeHoog acknowledged her diagnosis of schizoaffective disorder, recognizing that her mental illness causes anxiety, delusions, and possibly hallucinations. She did not agree with the diagnosis of narcissistic personality disorder. Ms. DeHoog denied ever being violent. In spite of what the medical reports indicated, she denied ever living out of a car, or that she took herself off her medications without her doctor's knowledge.

Ms. DeHoog denied that she was ever evicted from her apartment, and she took issue with Dr. Mire's report stating otherwise. She acknowledged that she was hospitalized after leaving her apartment but refuted statements contained in the medical records that she reported creaks in the floor, people in the walls, or radiation coming from the refrigerator.

When questioned about certain facts documented in the medical records, Ms. DeHoog explained that she was brought to UMC because she had an argument with Mr. DeHoog. She acknowledged that she stopped taking Geodon for over a

year, but stated that it was with Dr. Stewart's approval. She thought the medical report stating otherwise was inaccurate.

Ms. DeHoog testified that she went to River Place Hospital for stomach pains, thinking it was a normal hospital and ended up being admitted as a psychiatric patient. She denied being brought there by the New Orleans Police Department.

Ms. DeHoog was questioned about Dr. Mire's report, which indicated that she was admitted into St. Charles Parish Hospital in a severe state of psychosis due to missing several doses of medication. She did not think that was accurate. Ms. DeHoog denied fighting with the hospital staff and denied spitting out her medications into a napkin.

Ms. DeHoog acknowledged that she treated with Dr. Sharon Normand ("Dr. Normand") in 2021 and 2022. However, she denied that Dr. Normand terminated treatment because she was combative and angry about Dr. Normand testifying in her custody case. Ms. DeHoog also denied that she threatened Dr. Normand, and that the police were called to remove her from the office.

Ms. DeHoog testified that she has a certified public accountant as well as a financial advisor to help her manage the community property settlement. She was aware that the financial advisor had filed for bankruptcy within the last year or two.

Ms. DeHoog was not comfortable with the idea of Eleanor acting as her financial advisor, considering Eleanor to be only a child. She acknowledged that Eleanor had been emancipated, but thought it was due to coercion from Mr. DeHoog.

Following the July 2024 trial, a judgment was rendered on October 8, 2024, ruling, in pertinent part:

> **IT IS ORDERED, ADJUDGED AND DECREED** that clear and convincing evidence ***does not support the judgment of a full interdiction*** of **STEPHANIE R. DEHOOG**.  (Emphasis added).
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that after some monitoring for **STEPHANIE R. DEHOOG**, ***the Court will review whether or not limited interdiction should be granted.  The review will take place within 180 days from the date of trial.***  (Emphasis added).

The judgment further ordered that at the follow-up review, documents could be submitted to demonstrate Ms. DeHoog's compliance with her medication and medical treatment.  Ms. DeHoog was also ordered to furnish an accounting in connection with her community property settlement. Regarding the submission of additional evidence, it was ordered that "Mr. DeHoog shall not be provided with the documents requested by the Court pertaining to Ms. DeHoog's medical and financial compliance."

Appellants filed a supervisory writ application, which was denied.  *In Re: Interdiction of Stephanie R. DeHoog*, 2024-C-0675, (La. App. 4 Cir. 11/18/24), unpub.

Appellants also appealed the October 8, 2024 Judgment. In response, this Court ordered the trial court to amend the Judgment to state that it is a partial final judgment.  An Amended Judgment was issued on March 6, 2025, incorporating the above rulings from the October 8, 2024 Judgment. However, finding that the Amended Judgment still lacked the necessary decretal language, the appeal was dismissed without prejudice.  *In Re:*

13

*Interdiction of Stephanie R. DeHoog*, 2024-CA-0809, (La. App. 4 Cir. 3/27/25), unpub.[2]

Pursuant to the October 8, 2024 Judgment and the March 6, 2025 Amended Judgment, the trial court conducted a follow-up hearing on March 28, 2025, via Zoom, where only oral argument was presented. Ms. DeHoog's counsel submitted updated medical and financial records. Appellants were not provided with this evidence.

At the outset, we find it necessary to discuss a concerning issue regarding the record evidence in this matter. The transcript of the March 28, 2025 follow-up hearing demonstrates that during the proceedings, the trial court reviewed the evidence presented on behalf of Ms. DeHoog, stating that the documents "will be submitted into the record." The evidence was not provided to this Court when the appeal was lodged. Therefore, the trial court was ordered to supplement the appellate record. The record was not supplemented, and we have been advised by the Clerk of Court for the Civil District Court that no exhibits were filed from the March 28, 2025 hearing. Consequently, this Court has been put in an untenable position, as we have no evidence to review regarding Ms. DeHoog's circumstances following the July 2024 trial, which was the stated purpose of holding the proceedings open for monitoring.

Judgment was rendered on May 22, 2025, dismissing Appellants' petition for interdiction, finding that clear and convincing evidence does not support a judgment of full interdiction or limited interdiction. The judgment

---

[2] Much of the record and evidence reviewed in the instant matter is contained in appeal record 2023-CA-0809.

also granted Appellants' previously filed motion to discharge Mr. King as curator *ad hoc*, discharging him effective March 28, 2025. Appellants were ordered to pay Mr. King for his work in this matter since the July 2024 trial.

This timely appeal followed. Appellants assert that the trial court erred in: 1) denying the request for full, or alternatively limited interdiction pursuant to La. C.C. articles 389 and 390; 2) holding open the question of limited interdiction and monitoring Ms. DeHoog for over eight months, effectively subjecting her to civil outpatient involuntary commitment under the surveillance of the State of Louisiana; and 3) failing to discharge Mr. King as the court-appointed curator *ad hoc* on April 12, 2023 when Ms. DeHoog enrolled her own attorney, or alternatively in August of 2024 when they filed a motion to discharge Mr. King.

**DISCUSSION**

Appellants first argue that the trial court erred in denying the full or, alternatively, limited interdiction of Ms. DeHoog pursuant to La. C.C. arts. 389 and 390. In support, they submit that due to her mental illness, Ms. DeHoog is a danger to herself and to others, and that she cannot consistently manage her own affairs. As explained below, we find merit in Appellants' assignments of error.

It is well established that "[t]he petitioner in an interdiction proceeding bears the burden of proof by clear and convincing evidence." La. C.C.P. art. 4548. "The determination of whether to order interdiction is a factual finding, which cannot be set aside in the absence of manifest error or a clearly wrong determination." *In re Benson*, 2015-0874, p. 5 (La. App. 4 Cir. 2/24/16), 216 So.3d 950, 955 (citation omitted).

15

As thoroughly explained in *Interdiction of Constance*, 2023-0318, p.17 (La. App. 5 Cir. 3/22/24), 384 So.3d 1111, 1124:

> Full interdiction is warranted only when a person's interests cannot be protected by less restrictive means. A person's interests can be protected by less restrictive means if, for example, his interests: (1) are currently being protected by other legal arrangements, including a procuration, mandate, or trust, or (2) could be protected by other legal arrangements, including a limited interdiction. La. C.C. art. 389, cmt. (e); *Matter of Interdiction of Keith*, 17-1573 (La. App. 1 Cir. 6/22/18), 2018 WL 3080456. An individual is a candidate for full interdiction only if the individual is *consistently* unable to make reasoned decisions regarding the care of *both* his person *and* his property, or to communicate those decisions. *See* La. C.C. art. 389. If a person is unable consistently to make reasoned decisions regarding their person or property, *or any aspect of either their person or property*, then that person is a candidate for a limited interdiction. *See* La. C.C. art. 390; *Matter of Interdiction of Keith, supra.* (emphasis in original).

> A court may order the limited interdiction of a natural person of the age of majority, or an emancipated minor, who due to an infirmity is unable consistently to make reasoned decisions regarding the care of his person **or** property, **or** any aspect of either, or to communicate those decisions, and whose interests cannot be protected by less restrictive means. La. C.C. art. 390 (emphasis added). A judgment of limited interdiction confers "upon the limited curator only those powers necessitated by the interests of the limited interdict to be protected through limited interdiction." La. C.C.P. art. 4551(B). Under this Article, any right not specifically restricted in the judgment of limited interdiction is retained by the limited interdict. La. C.C. art. 390, cmt. (a); *see also* Interdiction and Continuing Tutorship—Rules on Interdiction, 2 La. Prac. Est. Plan. § 5:174 (2023-2024 ed.). (emphasis in original).

The effects of a full interdiction are more restrictive than a limited interdiction. "A full interdict lacks the capacity to make a juridical act," whereas a limited interdict only "lacks capacity to make a juridical act pertaining to the property or aspects of personal care that the judgment of limited interdiction places under the authority of his curator." *See* La. C.C. art. 395.

Based on our thorough review of the record, we cannot say that the evidence supports a judgment of full interdiction pursuant to La. C.C. art. 389. We recognize that interdiction is considered a harsh remedy. However, we find that Appellants have presented clear and convincing evidence that a limited interdiction over Ms. DeHoog's medical and financial affairs is necessary in this case.

The record is replete with expert and lay testimony demonstrating that Ms. DeHoog has a history of being non-compliant with her psychotic medications. It is also clear from the evidence that while Ms. DeHoog somewhat accepts her diagnosis, she has poor insight into the severity of her mental illness.

In opposing the interdiction, Ms. DeHoog relies heavily on Dr. Mire's opinion that interdiction is not warranted. However, we note that Dr. Mire qualified her opinion stating that she did not think interdiction was necessary "when she is well." Dr. Mire did recognize that interdiction may be the only "available legal option." More importantly, Dr. Mire unequivocally stated that Ms. DeHoog "will become ill again. She won't seek treatment on her own, and she'll need help."

The medical evidence presented here certainly supports the likelihood of Dr. Mire's prediction, and it is concerning to this Court that there are no protections currently in place. Throughout her history of hospitalizations, Ms. DeHoog has lacked insight into her psychotic behavior and was often in denial of her circumstances. As noted above, Dr. McConville recommended judicial commitment during Ms. DeHoog's hospitalization in 2022, due to her medical noncompliance.

The evidence also demonstrates that Ms. DeHoog has put herself in potential danger during her psychotic episodes, *e.g.*, non-directional walking in traffic, sleeping in parked cars, driving her car at all hours of the night ending up in different cities. Moreover, it is extremely concerning to this Court that Ms. DeHoog has demonstrated aggressive and violent behavior toward her mother, her sisters, Mr. DeHoog and even her own children.

Based on the above, we find that a limited interdiction as to Ms. DeHoog's medical affairs is necessary for her own protection and for the protection of those around her.

Regarding her financial affairs, we start by noting that Ms. DeHoog was to receive a substantial community property settlement. Both Mr. DeHoog and Eleanor testified that Ms. DeHoog has very limited experience handling finances during the marriage. Eleanor explained that from what she witnessed growing up, she did not trust her mother's responsibility with her finances. She believed her mother was not capable of managing her finances when she was ill.

The evidence presented clearly demonstrates that Ms. DeHoog is unable to consistently make rational decisions with regard to her healthcare and her financial affairs. Based on our thorough review of the record, we find that the trial court committed manifest error in failing to order a limited interdiction. Ms. DeHoog's extensive history of medication non-compliance and poor insight into her mental health demonstrates her inability to consistently make reasoned decisions regarding her medical care. Thus, this Court deems it necessary that a curator be appointed for the limited purpose of ensuring that Ms. DeHoog remains medication compliant. Further, due to

18

Ms. DeHoog's history of poor financial decision-making during her psychotic episodes, this Court finds that a curator is necessary to safeguard her finances and ensure that she does not make erratic financial decisions. Accordingly, a judgment of limited interdiction over Ms. DeHoog's medical and financial affairs is hereby rendered and, on remand, the trial court is ordered to render a judgment of limited jurisdiction as provided herein.

Regarding the appointment of a curator/undercurator, La. C.C. art. 4551(A) mandates that in a judgment of interdiction, the court shall appoint a curator and an undercurator, unless an undercurator is not required by law.[3] In this Court's opinion, Eleanor and Mr. DeHoog should be appointed curatrix and undercurator, respectively.

Eleanor's testimony demonstrates that she is clearly concerned for her mother's welfare. She testified that she was willing to take on the role of curatrix or undercuratrix, and strongly believes that the curator should be a family member as opposed to an attorney or someone else. Dr. Mire also expressed the opinion that Eleanor has the capacity and capability to act on her mother's behalf.

Dr. Mire considered Mr. DeHoog to be supportive of Ms. DeHoog, only opining that as Ms. DeHoog's ex-husband, a conflict could arise. Moreover, we note that Mr. DeHoog has demonstrated concern for Ms. DeHoog's medical care and her financial situation, even after their divorce. He has also demonstrated concern for his children's welfare in light of Ms. DeHoog's mental illness. Thus, we find that Mr. DeHoog could assist Eleanor and act as an appropriate undercurator.

---

[3] La. R.S. 9:1031 provides that when a nonprofit curatorship service program is appointed as curator, the appointment of an undercurator is not required.

19

While the evidence presented supports consideration of Eleanor as curatrix for Ms. DeHoog, it is unclear whether Eleanor would be legally qualified under La. C.C.P. art. 4561. Section B(1)(c) of article 4561 provides that "[a] nonresident of the state without a resident agent for service of process" is "not qualified to serve as a curator of an interdict."

The record does not confirm Eleanor's current residential status. The petition for interdiction indicates that Eleanor and Mr. DeHoog were domiciled in St. Tammany Parish when the action was filed. At the time of the July 2024 trial, Eleanor was planning to attend college out of state. Therefore, we remand to the trial court to determine whether Eleanor is legally qualified to act as curatrix pursuant to La. C.C.P. art. 4561. If necessary, the trial court is ordered to appoint a registered agent for service of process for Eleanor.

If it is determined that Eleanor is qualified in accordance with La. C.C.P. art. 4561, the trial court is ordered to appoint Eleanor curatrix and Mr. DeHoog undercurator in the limited interdiction. In the alternative, the trial court is directed to consider the appointment of a non-profit curatorship service program as curator for Ms. DeHoog pursuant to La. R.S. 9:1031.

Appellants next assert that the trial court erred in holding open the proceedings for "monitoring" for over eight months. We agree. The evidence presented at the July 2024 trial was compelling, making it clear and convincing that a limited interdiction was warranted *at that time*. Thus, we find that the trial court erred in holding the process open for monitoring, particularly without allowing Appellants an opportunity to review the supplemental documentation presented by Ms. DeHoog. Even more

problematic, as detailed above, is the fact that this evidence was not made a part of the appellate record for our review.  It is well established that an appellate court is a court of record and may not review evidence that is not in the appellate record.  *Bombace v. Starr Indemn. & Liab. Co*., 2025-0037, p. 11 (La. App. 4 Cir. 6/24/25), 416 So.3d 8, 16 (citation omitted).

In their final assignment of error, Appellants argue that the trial court erred in failing to discharge Mr. King as curator *ad hoc* on April 12, 2023, when Ms. DeHoog enrolled private counsel or, alternatively, in August of 2024, in response to their filing of a motion to discharge Mr. King.

Mr. King was appointed curator *ad hoc* for Ms. DeHoog on March 21, 2023.  Ms. DeHoog retained private counsel, and a motion to enroll was filed on April 12, 2023.  A corresponding Order was signed by the trial court on April 15, 2023.  On June 13, 2023, counsel of record for Ms. DeHoog sent Mr. King a formal request to withdraw via email, as authorized by Ms. DeHoog.  Mr. King did not withdraw.

On August 7, 2024, Appellants filed a Motion and Order for Immediate Discharge of Curator ad Hoc, attaching a copy of the above email.  Mr. King was ordered to show cause on September 20, 2024, why he should not be immediately discharged.  On September 1, 2024, Ms. DeHoog filed a memorandum in opposition to the motion to discharge Mr. King stating that Mr. King was still actively participating in the proceedings.

It does not appear from the record that a hearing was conducted on the motion to discharge.  Appellants submit in their brief to this Court that Mr. King failed to appear at the September 20, 2024 hearing, and the trial court orally reset the hearing for November 7, 2024, only to continue the matter

indefinitely without order. Mr. King remained curator *ad hoc* until he was discharged in the May 22, 2025 judgment.

Appellants argue here that the enrollment of private counsel triggered the requirement for Mr. King's dismissal pursuant to La. C.C.P. art. 4549(C). We agree.

La. C.C.P. art. 4549(C) provides:

> In an ex parte judgment of temporary interdiction and in every order scheduling a preliminary interdiction hearing, the court shall appoint an attorney to represent the defendant. If the defendant either retains his own attorney, or intelligently and voluntarily waives the assistance of an attorney, ***the court shall discharge the court-appointed attorney*** (Emphasis added).

Moreover, as noted above, Ms. DeHoog, through her attorneys of record, formally requested Mr. King to withdraw on June 13, 2023.

Based on the above, we find that the trial court erred in not discharging Mr. King once Ms. DeHoog retained private counsel, thereby allowing him to be paid for his work as curator *ad hoc* through the March 28, 2025 hearing. Accordingly, we reverse the trial court's ruling rendered in the May 22, 2025 judgment, which ordered Appellants to pay attorney's fees to Mr. King for work performed since the July 2024 trial. Furthermore, we order that any fees paid to Mr. King for work performed after June 13, 2023 be refunded to Appellants within ninety (90) days from the date of this Opinion.

**DECREE**

For the foregoing reasons, we reverse the May 22, 2025 judgment dismissing Appellants' petition for interdiction and render a judgment of limited interdiction, *specifically limited to Ms. DeHoog's medical and*

*financial affairs*. On remand, the trial court is ordered to render a judgment of limited interdiction as set forth herein, and in accordance with the mandates of C.C.P. art. 4551.[4]

On remand, the trial court is further ordered to expeditiously conduct a hearing to consider the appointment of Eleanor and Mr. DeHoog as curatrix and undercurator, respectively, and to appoint a registered agent for service of process on behalf of Eleanor, if necessary. In the alternative, the trial court is ordered to consider the appointment of a non-profit curatorship service program as curator for Ms. DeHoog pursuant to La. R.S. 9:1031.

Finally, finding that the trial court erred in failing to discharge Mr. King after Ms. DeHoog enrolled private counsel, we reverse that portion of the May 22, 2025 judgment, which allowed Mr. King to be compensated for work performed as curator *ad hoc* through the March 28, 2025 hearing. Judgment is hereby rendered in favor of Appellants, ordering that Mr. King refund any and all curator *ad hoc* fees paid to him for work performed after June 13, 2023, within ninety (90) days from the date of this Opinion.

_____

[4] La. C.C.P. art. 4551 provides:

A. In the judgment of interdiction, the court shall:

(1) Appoint a curator.
(2) Appoint an undercurator, unless an undercurator is not required by law.
(3) State that the powers of the curator commence only upon qualification.
(4) Direct the clerk of court to record the judgment in the conveyance and mortgage records of the parish where it was rendered.
(5) Set forth the name, domicile, age, and current address of the defendant.

B. In addition, a judgment of limited interdiction shall confer upon the limited curator only those powers necessitated by the interests of the limited interdict to be protected through limited interdiction and shall state that the limited interdict retains the capacity of a natural person except as expressly limited by the judgment.

C. In addition, a judgment granting or extending temporary or preliminary interdiction shall set forth the date of termination.

In light of the foregoing, each party is to bear their own costs associated with this appeal.

**JUDGMENT DISMISSING THE PETITION FOR FULL AND LIMITED INTERDICTION REVERSED; JUDGMENT OF LIMITED INTERDICTION RENDERED; REMANDED FOR APPOINTMENT OF A CURATOR/UNDERCURATOR IN ACCORDANCE WITH INSTRUCTIONS; JUDGMENT ORDERING MR. KING TO BE COMPENSATED AS CURATOR *AD HOC* THROUGH MARCH 28, 2025 REVERSED; JUDGMENT RENDERED ORDERING MR. KING TO REFUND ALL FEES RECEIVED AFTER JUNE 13, 2023, WITHIN NINETY DAYS**